1  Matthew R. Orr, Bar No. 211097
     morr@calljensen.com
2  Joshua G. Simon, Bar No. 264714
     jsimon@calljensen.com
3  CALL & JENSEN
   A Professional Corporation
4  610 Newport Center Drive, Suite 700
   Newport Beach, CA  92660
5  Tel:   (949) 717-3000
   Fax:  (949) 717-3100
6

7  Attorneys for Defendant Quincy Bioscience, LLC

8

9                    **UNITED STATES DISTRICT COURT**

10                **NORTHERN DISTRICT OF CALIFORNIA**

11

12  PHILLIP RACIES, On Behalf of Himself       Case No.  3:15-cv-00292 HSG
    and All Others Similarly Situated,
13                                             **NOTICE OF MOTION AND MOTION**
                                               **FOR SUMMARY JUDGMENT OF**
14            Plaintiff,                        **DEFENDANT QUINCY BIOSCIENCE,**
                                               **LLC; MEMORANDUM OF POINTS**
15            vs.                               **AND AUTHORITIES**

16  QUINCY BIOSCIENCE, LLC, a
    Wisconsin limited liability company,
17                                             Date:  January 7, 2016
                                               Time:  2:00 p.m.
18            Defendant.                        Place: Courtroom 15 – 18th Floor
                                                      450 Golden Gate Avenue
19                                                    San Francisco CA 94102
20

21                                             Complaint Filed:   January 21, 2015
22                                             Trial Date:        None Set

23

24

25

26

27

28

QUI09-02:1601049_10:11-3-15

1

# TABLE OF CONTENTS

2
Page

3
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ....................... 1

4
MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

5
I.      INTRODUCTION ................................................................................................... 1

6
II.     FACTUAL BACKGROUND ................................................................................... 3

7
        A.      The Challenged Advertising Claims ............................................................ 3

8
        B.      The Court's Order On Defendant's Motion to Dismiss ............................... 3

9
        C.      Dr. Richard Bazinet's Expert Report .......................................................... 4

10
        D.      The Deposition Of Dr. Richard Bazinet ...................................................... 5

11
                1.      Dr. Bazinet Is Not an Expert on Prevagen® or AQ .......................... 5

12
                2.      AQ Is Not "Completely" or "Fully" Digested ................................... 5

13

14
                3.      Prevagen® May Provide More Than Just a Trivial
                        Amount of Amino Acids ..................................................................... 7

15

16
                4.      Peptides Resulting from the Digestion of Prevagen®
                        Can Cross the BBB and Affect Neuron Function .............................. 8

17

18
                5.      Proteins and Peptides Need Not Cross the BBB to
                        Affect Brain Function ........................................................................ 9

19
                6.      Dr. Bazinet Criticizes the Use of Animal Studies
                        Supporting Quincy's Advertising Claims while
20
                        Relying on Animal Studies in His Own Work .................................. 9

21
III.    LEGAL STANDARDS ........................................................................................ 10

22
        A.      Standard Of Review .................................................................................... 10

23
        B.      CLRA Claim Elements .............................................................................. 11

24
        C.      UCL Claim Elements ................................................................................. 12

25
IV.     LEGAL ARGUMENT .......................................................................................... 13

26
        A.      Plaintiff Has No Affirmative Evidence That AQ Is
27                      Completely Destroyed And Does Not Cross The BBB And
                        Affect Brain Function ................................................................................. 13

28

1

**TABLE OF CONTENTS(con't)**

2

Page

3

B.    Even the Generalized Opinions Plaintiff's Expert Offered
      Have Been Proven Wrong By *His Own Testimony* ......................................15

4

C.    No Evidence Exists That Quincy Allegedly Deceived
      Consumers With Respect To Body Chemistry Issues..................................17

5

6

V.    CONCLUSION.....................................................................................18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANT QUINCY BIOSCIENCE,
LLC; MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Baba v. Hewlett-Packard Co.*,
  No. C 09-05946 RS, WL 2486353 (N.D. Cal. June 16, 2010)...................................17

*Brookhaven Typesetting Svcs., Inc. v. Adobe Sys., Inc.*,
  332 Fed. Appx. 387 (9th Cir. 2009) ..........................................................................13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................................................10

*Chavez v. Nestle USA, Inc.*,
  No. CV 09-9192, 2011 WL 2150128 (C.D. Cal. May 19, 2011)...............................13

*Cray Communications Inc. v. Novatel Computer Systems, Inc.*,
  33 F.3d 390 (4th Cir. 1994) .......................................................................................11

*Dailey v. Just Energy Mktg. Corp.*,
  No. 14-CV-02012-HSG, 2015 WL 4498430 (N.D. Cal. July 23, 2015) ...................10

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001) ...................................................................................11

*Fraker v. Bayer Corp.*,
  No. CV F 08-1564-AWI GSA, 2009 WL 5865687 (E.D. Cal. Oct. 6,
  2009) ..........................................................................................................................12

*Gonzalez v. Drew Industries Inc.*,
  No. CV 06-08233 DPP (JWJx), 2010 WL 3894791 (C.D. Cal. Sept.
  30, 2010) ....................................................................................................................11

*Johns v. Bayer Corp.*,
  No. 09CV1935 AJB DHB, 2013 WL 1498965 (S.D. Cal. Apr. 10,
  2013) ............................................................................................................12, 13, 17

*Kowalsky v. Hewlett-Packard Co.*,
  771 F. Supp. 2d 1156 (N.D. Cal. 2011)......................................................................17

CALL & JENSEN

**TABLE OF AUTHORITIES (con't)**

Page

*Nissan Fire & Marine Ins. Co. Ltd v. Fritz Cos., Inc.,*

   210 F.3d 1099 (9th Cir. 2000) ......................................................................... 11

*Stanley v. Bayer Healthcare LLC,*

   No. 11cv862–IEG (BLM), 2012 WL 1132920 (S.D. Cal. Apr. 3, 2012) .................. 13

*Stevens v. JPMorgan Chase Bank, NA.,*

   No. C09-03116 SI, 2010 WL 329963 (N.D. Cal. Jan. 20, 2010) ............................. 14

*Wilson v. Hewlett-Packard Co.,*

   668 F.3d 1136 (9th Cir. 2012) ......................................................................... 12

**State Cases**

*Bains v. Moores,*

   172 Cal. App. 4th 445 (2009) ......................................................................... 17

*Durrell v. Sharp Healthcare,*

   183 Cal. App. 4th 1350 (2010) ....................................................................... 12

*Hall v. Time Inc.,*

   158 Cal. App. 4th 847 (2008) ......................................................................... 12

*In re Firearm Cases,*

   126 Cal. App. 4th 959 (2005) ......................................................................... 12

*Kwikset Corp. v. Superior Court,*

   51 Cal. 4th 310 (2011) .................................................................................... 12

*Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.,*

   107 Cal. App. 4th 1336 (2003) ........................................................ 12, 13, 14, 16

*Nelson v. Pearson Ford Co.,*

   186 Cal. App. 4th 983 (2010) ........................................................................... 1

# TABLE OF AUTHORITIES (con't)

Page

**State Statutes**

Cal. Bus. & Prof. Code §§ 17200 and 17500 ............................................................... 1, 12

Cal. Bus. Prof. Code § 17204 ........................................................................................ 12

Cal. Civ. Code § 1750, et seq. ............................................................................... 1, 11, 12

Cal. Civ. Code § 1770 ........................................................................................... 11, 12

Cal. Civ. Code § 1770(a) ....................................................................................... 11, 12

**Federal Rules**

Federal Rule of Evidence 56 ............................................................................................ 10

1    <u>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**</u>

2    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3         **PLEASE TAKE NOTICE** that on January 7, 2016 at 2:00 p.m., or as soon

4    thereafter as the matter may be heard in Courtroom 15 of the United States District

5    Court for the Northern District of California, located on the 18th Floor at 450 Golden

6    Gate Avenue, San Francisco, California 94102, Defendant Quincy Bioscience, LLC

7    ("Quincy") will and hereby does move for summary judgment on Plaintiff's claims

8    under California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200

9    and 17500) and the Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1750,

10   et seq.).

11        This motion is made pursuant to Federal Rule of Civil Procedure 56 and Civil

12   Local Rules 7-2, 7-3, 56-1, and 56-2 on the grounds that there is no genuine issue of

13   material fact as to either of Plaintiff's claims, and Quincy is entitled to judgment as a

14   matter of law on both claims.  Alternatively, if the Court does not grant the summary

15   judgment disposing all Plaintiff's claims, Quincy moves for summary judgment of the

16   following claims and issues on the grounds that there is no genuine issue of material

17   fact on each issue and Quincy is entitled to judgment as a matter of law:

18   (1) Plaintiff's claims under the UCL and CLRA fail because there is no genuine

19        issue of material fact that a portion of the protein in Quincy's product is not

20        completely destroyed via digestion, and Quincy is entitled to judgment as a

21        matter of law;

22   (2) Plaintiff's claims under the UCL and CLRA fail because there is no genuine

23        issue of material fact that it is possible for a portion of the protein in Quincy's

24        product to cross the blood brain barrier and affect brain function, and Quincy

25        is entitled to judgment as a matter of law;

26   (3) Plaintiff's claims under the UCL and CLRA fail because Plaintiff does not

27        raise a genuine issue of material fact that it is possible for the protein in

28

Quincy's product or a portion of it to affect brain function without crossing the blood brain barrier, and Quincy is entitled to judgment as a matter of law;

(4) Plaintiff's claims under the UCL and CLRA fail because Plaintiff cannot prove that Quincy deceived consumers with regard to the digestion of the protein in Quincy's product or whether a portion of it crosses the blood brain barrier and affects brain function, and Quincy is entitled to judgment as a matter of law;

(5) Plaintiff's claims under the UCL and CLRA fail based on his body chemistry allegations because Plaintiff does not raise a genuine issue of material fact that Quincy's statements are not false and deceptive, and Quincy is entitled to judgment as a matter of law.

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities hereunder, the concurrently filed Declaration of Joshua G. Simon and the documents and materials attached thereto, including the expert report of Dr. Richard Bazinet and the excerpts of his deposition transcript, the pleadings and papers on file herein, and such other matters as may be presented to the Court at the time of the hearing, the pleadings and records on file in this case, and such other pleadings and oral argument as may be presented to the Court at any hearing on this motion.

Dated: November 3, 2015

CALL & JENSEN,
A Professional Corporation
Matthew R. Orr
Joshua G. Simon


By:/s/ Joshua G. Simon
Joshua G. Simon

Attorneys for Defendant Quincy Bioscience, LLC

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

In framing the issues in the present summary judgment motion, this Court held as a matter of law that Plaintiff's lawsuit cannot be based upon attacks of the clinical substantiation of Quincy's advertising claims; rather, the lawsuit could only proceed if Plaintiff could prove its "body chemistry allegations" that "the apoaequorin in the product is destroyed by the human digestive system or is of such a trivial amount that it cannot biologically affect memory or support brain function."  (Doc. No. 34 at 6.) Thus, the only issue before this Court in the present motion is whether the apoaequorin ("AQ") in Prevagen® is completely destroyed via digestion and/or incapable of passing through the blood brain barrier ("BBB").  Because there is no genuine issue of material fact that AQ, or a portion of it, is not completely destroyed via digestion and that it is possible for a portion of AQ to cross the BBB and affect brain function, Plaintiff cannot proceed with his false advertising lawsuit, and Defendant is entitled to a judgment as a matter of law.

The only evidence proffered by Plaintiff in support of his body chemistry allegations is the bare assertion of a single expert that Prevagen® cannot work as advertised (an ultimate opinion that goes beyond the current scope of discovery and this motion as defined by the Court).  The expert argues that (1) the active ingredient in Prevagen®, AQ, is no different than any other protein and is "completely" and "fully" digested into amino acids; (2) the amount of AQ in the prescribed dosage of Prevagen® only provides a trivial amount of amino acids; and (3) Prevagen® cannot pass the blood-brain barrier ("BBB") and can never enter the brain.

In deposition, however, the expert admitted he is not an expert on protein digestion, and had never studied or tested Prevagen® or AQ; and none of the articles he relied upon for his opinions specifically concern AQ.  Perhaps most significantly, the expert further admitted in his report and during his deposition that Prevagen® is *not* "completely" or "fully" digested.  Rather, AQ is broken down into *both* single amino

acids *and small chains of amino acids, called peptides*.   Significantly, the expert admitted that peptides can be absorbed by the human body, cross the BBB and affect brain function.   The expert's report does not even consider the issue of peptides resulting from AQ digestion, much less the possibility that a unique or uncommon peptide could result from the digestion of AQ and contribute to memory support or healthy brain function.   Moreover, the expert admitted that both proteins and peptides can affect brain function without even crossing the BBB.   The expert proffers no opinion excluding that possibility with respect to AQ or its derivative peptides after digestion.   This, alone, is fatal to Plaintiff's body chemistry allegations.

Nor does Plaintiff proffer any evidence that Quincy knowingly deceived consumers with respect to the body chemistry issues.   There is no evidence that Quincy knew, or should have known, of the purported body chemistry claims of Plaintiff's proffered expert at the time Quincy marketed and advertised its products.   The expert's report criticizes only some of the studies supporting the proposition that AQ is not fully digested but omits others, and the criticisms are largely unwarranted.   For example, the expert criticizes animal models used in AQ studies simply because they are animal studies and purportedly have no applicability on the human body.   But the expert has used animal models himself repeatedly in the past to make hypotheses and draw conclusions about the human body.

For the foregoing reasons as detailed more fully below, Plaintiff has not met, and cannot meet, his burden of proving that the AQ in Prevagen® is completely destroyed via digestion and cannot cross the BBB, and that Quincy knowingly deceived consumers with respect to those issues.   Pursuant to the Court's Order, Plaintiff cannot proceed with his lawsuit.

/ / /

/ / /

CALL&
JENSEN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    FACTUAL BACKGROUND

### A.    The Challenged Advertising Claims

Plaintiff purports he purchased Prevagen® after reading the product's label.  FAC ¶ 20.  Plaintiff alleges he relied on certain representations on the front of the Prevagen® label in making his purchase; namely, that the product contains a "Clinically Tested Ingredient," and that the Product "[i]mproves [m]emory" and "[s]upports" "Healthy Brain Function," "Sharper Mind," and "Clearer Thinking."  *Id.* ¶ 23.  Plaintiff also alleges he relied on certain representations located on the back of the Prevagen® label indicating that clinical studies have shown that Prevagen® "help[s] with mild memory problems associated with aging" and "improve[s] memory within 90 days."  *Id.* ¶ 26. These representations are referred herein collectively as "Prevagen® advertising claims."

### B.    The Court's Order On Defendant's Motion To Dismiss

Quincy filed a motion to dismiss alleging that Plaintiff's lawsuit amounts to an impermissible substantiation claim.  (Doc. No. 27.)  This Court agreed in part and rightly dismissed Plaintiff's claims to the extent they relied on a lack of substantiation theory.  (Doc. No. 34 at 4–6.)  The Court, however, held that Plaintiff's lawsuit could survive the pleading stage given what the Court termed as Plaintiff's "body chemistry allegations" that "the apoaequorin in the product is destroyed by the human digestive system or is of such a trivial amount that it cannot biologically affect memory or support brain function."  (Doc. No. 34 at 6.)  The Court identified the specific body chemistry allegations upon which the lawsuit could proceed:

> Plaintiff alleges that Defendant's representations that its Product improves memory and supports brain function are "false, misleading, and reasonably likely to deceive the public" because
>> one of the world's foremost experts in brain chemistry . . . has concluded that: (1) [the Product] cannot work as represented because apoaequorin, the only purported active ingredient in [the Product], is completely destroyed by the digestive system and transformed into common amino acids no different


CALL&
JENSEN

than those derived from other common food products . . . ; (2) the average daily diet contains about 75 grams of protein, contains all the required amino acids, and has about 7,500 times more amino acids than [the Product] (10 mg or 0.01 grams) and, as a result, any amino acids derived from the digestion of [the Product] would be massively diluted and could have no measurable effect on the brain; (3) ingestion of [the Product] cannot and does not have any effect on brain function or memory.

*Id.* ¶¶ 1-3.  Plaintiff further alleges that because the Product cannot provide the promised benefits as a matter of body chemistry, "there can never be any competent and reliable scientific evidence supporting Defendant's brain function and memory representations" and therefore the Defendant's representations that the Product is "clinically tested" are also false and misleading under the UCL. *Id.* ¶ 5. **These** allegations are collectively referred to herein as the "body chemistry allegations."

(Doc. No. 34 at 1 (*emphasis added*).)  The Court further ordered Discovery shall be limited to those claims and legal theories that remain.  (Doc. No. 34 at 9.)

## C.   Dr. Richard Bazinet's Expert Report

In support of his body chemistry allegations, Plaintiff submits the expert report of Dr. Richard Bazinet.  (Declaration of Joshua G. Simon ("Simon Decl.") Ex. A (Bazinet Report).)  Dr. Bazinet opines that, first, Prevagen® is "completely" or "fully" digested into amino acids, no different than any other protein.  (*Id*. ¶¶ 8, 11, 28, 30.)  Second, he argues "a daily dose of Prevagen only provides a trivial amount of amino acids compared to the substantial amount of amino acids supplied by other proteins in our daily diets."  (*Id*. ¶ 8; see also ¶¶ 16–20).  Third, he argues that Prevagen® cannot pass the blood-brain barrier ("BBB") and can never enter the brain.  (*Id*. ¶¶ 8, 21–30.)  In support of these opinions, Dr. Bazinet relies on articles cited in his report, documents produced by Quincy, and his 12 years of experience as a purported "expert in brain chemistry and nutritional sciences."  (*Id*. ¶ 8.)

Dr. Bazinet devotes more than half of his report to criticizing certain studies regarding the effects of AQ on animals.  (*Id*. ¶ 31–79.)  Dr. Bazinet's report, however,

- 4 -

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANT QUINCY BIOSCIENCE, LLC; MEMORANDUM OF POINTS AND AUTHORITIES

1  ignores other certain studies of AQ showing cognitive enhancement and improved

2  memory as discussed more fully below.

3  ### D.  The Deposition Of Dr. Richard Bazinet

4  Dr. Bazinet was deposed regarding the opinions in his expert report and the bases

5  for those opinions.  (Simon Decl. Ex. B (Bazinet Depo.).)  Dr. Bazinet's deposition

6  testimony plainly contradicts the key opinions from his expert report.

7  ### 1.  Dr. Bazinet Is Not an Expert on Prevagen® or AQ

8  Dr. Bazinet admitted he has not previously studied Prevagen® or AQ and is not

9  an expert on those substances.  (Simon Decl. Ex. B (Bazinet Depo.), 35:3–15.)  Dr.

10 Bazinet did not inspect the Prevagen® product or conduct any interviews regarding the

11 product.  (*Id.*, 31:17–25; 32:17–19; 33:9–15.)  Nor did he perform any tests whatsoever

12 on either Prevagen® or AQ.  (*Id.*, 27:7–12, 21–23; 33:19–34:2; 112:25–113:5; 126:16–

13 21.)  Dr. Bazinet testified that his opinions pertain to all dietary proteins, rather than AQ

14 in particular.  (*Id.*, 66:13–24; 256:13–23; 260:17–24.)  Yet Dr. Bazinet testified he

15 specializes in lipids, not protein digestion.  (*Id.*, 35:14–36:8; 37:7–10; 38:1–11.)  None

16 of the scientific articles Dr. Bazinet consulted concern AQ, and he did not consult with

17 any of his colleagues at the University, who are experts and specialists on proteins and

18 protein digestion.  (*Id.*, 14:2–15:25; 22:1–11; 240:23–241:7.)

19 ### 2.  AQ Is Not "Completely" or "Fully" Digested

20 Dr. Bazinet repeatedly admitted in deposition that AQ is not "completely" or

21 "fully" digested as stated in his report but that AQ is broken down into *both* single

22 amino acids *and* small chains of amino acids, called peptides.  (Simon Decl. Ex. B

23 (Bazinet Depo.), 110:17–22; 121:2–8; 122:5–16; 141:17–142:16; 256:13–23; 260:17–

24 24.)  This admission is critical because Dr. Bazinet admits that peptides can affect brain

25 function.  (Simon Decl. Ex. B (Bazinet Depo.), 59:3–5; 142:11–16; 268:5–8; *see also*

26 further discussion in Part II.D.4, *infra*).  Furthermore, Dr. Bazinet readily admits that

27 peptides can be absorbed into the blood of humans and cross the BBB:

28

CALL&
JENSEN

Q.     Sometimes like you just recently testified, things aren't fully digested in the stomach by pepsin; right?

A.     Correct.

Q.     And so further breakdown occurs in the GI tract with those other enzymes; right?

A.     Correct.

Q.     And that breakdown is either into smaller peptides or single amino acids; right?

A.     Correct.

Q.     And a peptide can be broken down into smaller peptides?

A.     Correct.

Q.     It doesn't necessarily have to be broken down into single amino acids in the GI tract; right?

A.     Correct.

Q.     And it can enter the blood as a peptide; right?

A.     Correct.

Q.     And we established earlier that peptides can cross the BBB; right?

A.     So –

Q.     Certain peptides can cross the BBB; right?

A.     Yes, we established that certain peptides can cross the BBB.

(*Id*. 141:17–142:16.)

Dr. Bazinet testified that proteins may vary in terms of how much of the protein is broken down into single amino acids as opposed to peptides. (*Id*., 259:2–9.) But because Dr. Bazinet did not test AQ, he has no knowledge of the peptides resulting from the digestion of AQ or how AQ may compare to other dietary proteins in this respect. (*See Id.*, 297:11–298:15.) Although he opines regarding the digestion of AQ in the gut, Dr. Bazinet conceded in deposition that he performed no digestion studies on

CALL&
JENSEN

1  AQ and, in fact, is not even a specialist on protein digestion. (*Id.*, 35:14–36:8; 37:7–10;
2  38:1 11.)

3      Dr. Bazinet testified that the mixture of AQ and other ingredients in the
4  Prevagen® capsules could possibly delay digestion of AQ in the gut, but he has not run
5  any studies to determine whether the mixture would have any effect on digestion of AQ.
6  (Simon Decl. Ex. B (Bazinet Depo.), 116:16–22; 126:16–21.)  Nor is Dr. Bazinet aware
7  of any studies regarding the possible effect of the Prevagen® mixture on the digestion
8  of AQ.  (*Id.*, 126:22–127:13.)  Dr. Bazinet is aware of reports showing the existence of
9  proteins that are resistant to pepsin, the digestive enzyme in the stomach, and he has not
10  ruled out the possibility that AQ could be a pepsin resistant protein.  (*Id.*, 133:23–
11  134:10.)

12      3.      **Prevagen® May Provide More Than Just a Trivial Amount**
13          **of Amino Acids**

14      Plaintiff's "dilution" argument compares the amount of *amino acids* generated by
15  AQ with that generated by all dietary proteins.  (Doc. No. 34 at 1.)  As stated above, Dr.
16  Bazinet conceded in deposition that AQ is not completely or fully destroyed via
17  digestion because it is broken down into peptides, not just single amino acids.  (Simon
18  Decl. Ex. B (Bazinet Depo.), 110:17–22; 121:2–8; 122:5–16; 141:17–142:16; 256:13–
19  23; 260:17–24.)  Dr. Bazinet testified that it was mathematically possible for a unique
20  small peptide (small enough to cross the BBB) to be generated by a partial digestion of
21  AQ.  (*Id.*, 299:11–22; 261:18–263:8.)  Bazinet's report does not even consider this issue
22  of peptides resulting from AQ digestion, much less the possibility that a unique or
23  uncommon peptide small enough to cross the BBB could result from digestion of AQ.
24  In fact, Dr. Bazinet only "eyeballed" AQ's amino acid sequence and could not
25  remember any particular portion of it.  (*Id.*, 243:8–17.)  He testified that he has not
26  determined whether the peptides generated from AQ completely overlap with those of
27  other dietary proteins, including proteins from bread and hotdogs, although a test could
28  be run to make such a determination.  (*Id.*, 297:11–298:15.)  Thus, Dr. Bazinet renders

no opinion of the potential peptides that could result from AQ, whether they could cross the BBB, and how common or uncommon these potential AQ-derived peptides are compared to the peptides that could be generated by all other dietary proteins.

In fact, Dr. Bazinet testified that dietary proteins may contain 50 different types of amino acids, and the potential combinations of amino acid sequences or peptides resulting from digestion of dietary proteins could be infinite. (Simon Decl. Ex. B (Bazinet Depo.), 287:15–288:2 ("There's all kinds of combinations. It goes on forever.").) Although he was unable to calculate the figure, Dr. Bazinet testified that the number of different types of possible tripeptides (a sequence of three amino acids) or quadropeptides/tetrapeptides (a sequence of four amino acids) that could result from the partial breakdown of all dietary proteins would be very large. (*Id.* 287:15–289:15.) The larger the number of *possible* peptides, the less likely that the peptides *actually generated* by the limited number of dietary proteins a human ingests could cover all possibilities, including covering *all* possible peptides that AQ could generate. Dr. Bazinet did not provide any evidence on the likelihood of the proteins in a human diet actually generating *all* tripeptides and quadropeptides that AQ could generate. (*Id.*, 297:11–298:15.)

In addition, in forming his opinions, Dr. Bazinet did not consider the recommended timing of Prevagen® supplementation. The prescribed use is to take Prevagen® in the morning with or without food, but not simultaneously with the purported 75,000 mg of other proteins in the average daily diet. (Simon Decl. Ex. B (Bazinet Depo.), 286:5–20; 287:6–14.)

### 4.   Peptides resulting from the Digestion of Prevagen® Can Cross the BBB and Affect Neuron Function

Although Dr. Bazinet testified he is not aware of any dietary proteins crossing the BBB, he readily conceded in deposition that peptides can cross the BBB and affect brain function. (Simon Decl. Ex. B (Bazinet Depo.), 59:3–5; 142:11–16; 268:5–8; *see also* 261:18–263:8 (further establishing that peptides can be small enough and also have

high lipid solubility to cross the BBB).)  Dr. Bazinet also testified that there may be receptors that allow peptides derived from AQ to cross the BBB.  (*Id.*, 238:15–239:17.) What is more, Dr. Bazinet testified that he has not ruled out the possibility that AQ could bind to a serum protein that could then bind to a BBB receptor to transport AQ across the BBB.  (*Id.*, 245:14–246:11.)

Notably, Dr. Bazinet testified that a single protein or peptide molecule can affect brain function.  (Simon Decl. Ex. B (Bazinet Depo.), 277:10–278:10: 278:25–279:13.) Specifically, he testified that proteins and peptides can serve as "ligands," ligands can bind to receptors in neurons, and a single molecule of a ligand may be sufficient to activate a single neuron and affect brain function.  (*Id.*)  Dr. Bazinet does not rule out the possibility of AQ or a peptide resulting from AQ acting in such a manner.

### 5.    Proteins and Peptides Need Not Cross the BBB to Affect Brain Function

Dr. Bazinet testified that proteins and peptides can affect memory indirectly without crossing the BBB.  (Simon Decl. Ex. B (Bazinet Depo.), 79:2–7; 75:4–76:7.) Dr. Bazinet's report does not discuss, let alone rule out, the possibility that AQ could have an indirect—but real—effect on memory.  More specifically, Dr. Bazinet testified that peptides can have functional properties, rather than just nutritional properties, and peptides can affect brain function without crossing the BBB in view of their functional properties.  (*Id.*, 271:18–272:6; 272:19–273:24; 279:20–280:2.)  Moreover, Dr. Bazinet testified that both proteins and peptides can act as signaling molecules, thereby affecting brain function whether or not they actually enter the brain.  (*Id.*, 274:2–18.)

### 6.    Dr. Bazinet Criticizes the Use of Animal Studies Supporting Quincy's Advertising Claims while Relying on Animal Studies in His Own Work

Dr. Bazinet's report criticizes some the animal studies supporting Quincy's advertising claims because of "the inapplicability of drawing conclusions about what happens in humans from animal studies".  (Simon Decl. Ex. A (Bazinet Report), ¶ 57;

CALL&
JENSEN

*see also Id.* ¶ 40, 73.)   However, Dr. Bazinet, himself, has used animal models and studies in the past to make hypotheses and draw conclusions about the human body. (Simon Decl. Ex. B (Bazinet Depo.), 154:13–156:22.)   Moreover, he is aware of famous examples of researchers studying learning using dogs as a model, such as Pavlov's dog. (*Id.*, 234:1–22.)   Dr. Bazinet also ignored the results of a certain study of 24 dogs showing that AQ improved cognitive enhancement.   (*Id.*, 223:7–224:1, Ex. 11.)   He testified that he did not consider the study because there were no measurements of body chemistry in it, (*Id.* 225:22–226:7, 227:8–23), but he also testified that cognitive enhancement necessarily involves issues of body chemistry.   (*Id.*, 230:21–24; 231:14–20; 233:2–5, 13–21.)   In other words, the *positive* cognitive results from an animal study would indicate that AQ, or at least a part of the protein, could be absorbed and have a biological effect in dogs, which may serve as a model for humans.

## III.   LEGAL STANDARDS

### A.   Standard of Review

A motion for summary judgment under Federal Rule of Civil Procedure 56 must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation omitted).   A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.   *See Id.*

The moving party bears the initial burden of establishing that no genuine issue of material fact exists, which can be done merely by showing "that there is an absence of evidence to support the nonmoving party's case."   *Dailey v. Just Energy Mktg. Corp.*, No. 14-CV-02012-HSG, 2015 WL 4498430, at *2 (N.D. Cal. July 23, 2015) (quoting *Celotex*, 477 U.S. at 325).   Summary judgment is appropriate where the opposing party

1  does not have enough evidence of an essential element of its claim to carry its ultimate

2  burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. Ltd v. Fritz Cos., Inc.*, 210

3  F.3d 1099, 1102 (9th Cir. 2000); *Gonzalez v. Drew Industries Inc.*, No. CV 06-08233

4  DPP (JWJx), 2010 WL 3894791, *2 (C.D. Cal. Sept. 30, 2010) ("On an issue as to

5  which the nonmoving party will have the burden of proof, however, the movant can

6  prevail merely by pointing out that there is an absence of evidence to support the

7  nonmoving party's case.")  This "'showing' can be made by pointing out through

8  argument – the absence of evidence to support plaintiff's claim." *Devereaux v. Abbey*,

9  263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) (internal quotations omitted); *Cray*

10  *Communications Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 394 (4th

11  Cir. 1994).

12  **B.    CLRA Claim Elements**

13  Plaintiff's claim arises under the California Consumer Legal Remedies Act

14  (CLRA), Cal. Civ. Code § 1750 *et seq*.  The CLRA prohibits "unfair methods of

15  competition and unfair or deceptive acts or practices undertaken by any person in a

16  transaction intended to result or which results in the sale or lease of goods or services to

17  any consumer."  Cal. Civ. Code § 1770(a).  The CLRA specifically lists the prohibited

18  "unfair methods of competition and unfair or deceptive acts or practices," and a plaintiff

19  must prove that the defendant's conduct falls under one of the listed unlawful acts or

20  practices.  *See, e.g.*, *Nelson v. Pearson Ford Co.*, 186 Cal. App. 4th 983, 1021-22

21  (2010).

22  Here, Plaintiff must prove: (1) Quincy violated one or more of the provisions of

23  § 1770(a); (2) that he relied on these alleged misrepresentation; (3) that he suffered

24  harm; and (4) as a result of his reliance on Quincy's misrepresentation.  *Nelson v.*

25  *Pearson Ford Co.*, 186 Cal. App. 4th 983, 1021-22 (2010).  In addition, while fraud is

26  not an essential element of CLRA, because Plaintiff's claims sound in fraud (FAC at ¶

27  68), Plaintiff must prove that Quincy had knowledge of its alleged fraud-based actions

28

1    under the CLRA.  *See, e.g.*, *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145-1146

2    (9th Cir. 2012).

3        **C.    UCL Claim Elements**

4        To prevail on a UCL claim, a plaintiff must show: (1) the defendant committed

5    an "unlawful, unfair or fraudulent business act or practice," (2) plaintiff "suffered injury

6    in fact," and (3) Plaintiff "lost money or property as a result of" defendant's business

7    act or practice.  Cal. Bus. Prof. Code §§ 17200, 17204.  Plaintiff's burden can only be

8    satisfied by affirmative evidence that ***Quincy's specific labels are false or misleading***,

9    and that ***Prevagen® or AQ specifically does not work***.  *See Nat'l Council Against*

10   *Health Fraud, Inc. v. King Bio Pharm., Inc.*, 107 Cal. App. 4th 1336, 1347-48 (2003)

11   ("King Bio") (plaintiffs have the burden of producing evidence of the falsity of the

12   advertising claims through "testing, scientific literature, or anecdotal evidence").

13   Plaintiff cannot meet his burden by claiming that the representations are

14   unsubstantiated.  *Id.*; *Johns v. Bayer Corp.*, No. 09CV1935 AJB DHB, 2013 WL

15   1498965, at *30, 36, 40, 43 (S.D. Cal. Apr. 10, 2013), *appeal dismissed* (Sept. 19,

16   2013); *Fraker v. Bayer Corp.*, No. CV F 08-1564-AWI GSA, 2009 WL 5865687, at *8

17   (E.D. Cal. Oct. 6, 2009).

18       To recover under the UCL, a plaintiff must demonstrate that she lost "money or

19   property," *i.e.* "economic injury" "as a result of" defendant's business practice. Cal.

20   Bus. Prof. Code § 17204; *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 333 (2011).

21   The UCL's "as a result of" language "imposes an actual reliance requirement." *Durrell*

22   *v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1362-63 (2010); *see also Kwikset Corp. v.*

23   *Superior Court*, 51 Cal. 4th 310, 326-27 & n.9 (2011); *Hall v. Time Inc.*, 158 Cal. App.

24   4th 847, 855-58 (2008); *cf. In re Firearm Cases*, 126 Cal. App. 4th 959, 977-82 (2005).

25   / / /

26   / / /

27

28

IV.   **LEGAL ARGUMENT**

    A.   **Plaintiff Has No Affirmative Evidence That AQ Is Completely Destroyed And Does Not Cross The BBB And Affect Brain Function.**

Under California law, Plaintiff "bears the burden of proving the advertising claims to be false or misleading." *King Bio*, 107 Cal. App. 4th at 1345, 1348; *see also Johns v. Bayer Corp.*, 2013 WL 1498965, at *30 ("[I]n a false advertising case under the UCL and CLRA, the plaintiff 'bears the burden of proving that the defendant's advertising claim is false or misleading'") (quoting *King Bio*); *Stanley v. Bayer Healthcare LLC*, No. 11cv862–IEG (BLM), 2012 WL 1132920, at *6 (S.D. Cal. Apr. 3, 2012) (granting summary judgment motion where plaintiff's claims relied on inconclusive expert testimony and defendant had not substantiated its labeling); *Chavez v. Nestle USA, Inc.*, No. CV 09-9192, 2011 WL 2150128, at *5-6 (C.D. Cal. May 19, 2011); *Fraker v. Bayer Corp.*, No. CV F 08-10 15649, 2009 WL 5865687, at *8 (E.D. Cal. Oct. 6. 2009).   In this case, to survive summary judgment, Plaintiff must support his body chemistry allegations with **<u>affirmative evidence</u>** regarding Prevagen® or AQ, specifically.   *See King Bio*, 107 Cal. App. 4th at 1347; *Johns v. Bayer Corp.*, 2013 WL 1498965, at *36 ("Accordingly, **<u>in the absence of affirmative scientific evidence</u>** available during the Class Period that proves that zinc and vitamin E did not support prostate health . . . Plaintiffs' claims are based on "lack of substantiation" rather than proof of falsity.") (*emphasis added*).

Plaintiff's sole expert does not offer any affirmative evidence that Prevagen® or AQ, specifically, is completely destroyed via digestion and does not cross the BBB and affect brain function.   Part II.D.1, *supra*; *see King Bio,* 107 Cal. App. 4th at 1347; *Johns v. Bayer Corp.*, 2013 WL 1498965, at *1, 36, 40, 43; *cf Brookhaven Typesetting Svcs., Inc. v. Adobe Sys., Inc.*, 332 Fed. Appx. 387, 390 (9th Cir. 2009) (affirming summary judgment because "the expert's declaration did not provide a sustainable basis upon which a triable case of misappropriation could be founded" and "[t]he only specific examples were conclusory, with no detail provided").   Rather, Plaintiff's expert merely

QUI09-02:1601049_10:11-3-15       - 13 -

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANT QUINCY BIOSCIENCE, LLC; MEMORANDUM OF POINTS AND AUTHORITIES

1   hypothesizes regarding the digestion of AQ in the human body without any real testing
2   or AQ-specific literature, and then he cherry picks certain evidence showing AQ's
3   efficacy and criticizes it while ignoring other substantial evidence.  On this record,
4   Plaintiff cannot survive summary judgment.

5        The affirmative evidence a plaintiff has the burden to produce at the summary
6   judgment stage must be **specific**.  It must be directly related to the accused product.  In
7   *King Bio*, the plaintiff alleged that defendant falsely advertised the efficacy of its
8   homeopathic drug products.  107 Cal. App. 4th at 1347.  Plaintiff presented expert
9   testimony of the inefficacy of homeopathic remedies in general, but presented no
10  evidence concerning the efficacy of King Bio's products specifically.  *Id.*  The court
11  noted that "homeopathic remedies are marketed and readily available for testing by a
12  plaintiff," and that just because the plaintiff did "not wish to bear the expense of
13  proving its case does not mean that the burden and expense should be shifted to King
14  Bio." *Id.* at 1348.

15       Accordingly, the California Court of Appeals affirmed the Superior Court's
16  granting of judgment for King Bio, holding that the plaintiff had failed to meet its
17  burden "of producing evidence that the challenged advertising claims of King Bio are
18  false or misleading."  *Id.* at 1344; *see also Id.* at 1340; *Stevens v. JPMorgan Chase*
19  *Bank, NA.*, No. C09-03116 SI, 2010 WL 329963, at *4-5 (N.D. Cal. Jan. 20, 2010)
20  (dismissing false advertising and misleading practices complaint based on *King Bio*
21  when complaint provided nothing more than mere labels and conclusions).

22       Much like the plaintiff's expert in *King Bio*, what Dr. Bazinet offers here is a
23  theory regarding dietary proteins in general, and not the product at issue.  In support of
24  his opinion that the Prevagen® advertising claims are false, Dr. Bazinet, Plaintiff's sole
25  expert, opines on three points: (1) Dietary proteins are "completely" or "fully" digested
26  to single amino acids; (2) AQ would generate the same amino acids as the other dietary
27  proteins, so the effect of 10 mg of AQ would be "diluted" by 75,000 mg of other
28  proteins a person ingests every day; and (3) Ingested proteins cannot have any effect on

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANT QUINCY BIOSCIENCE,
LLC; MEMORANDUM OF POINTS AND AUTHORITIES

1  brain function or memory.  None of these opinions is based on any evidence specific to

2  AQ or Prevagen®.  Therefore, Plaintiff has failed to present any competent evidence to

3  prevent a summary judgment in favor of Quincy.

**B.    Even the Generalized Opinions Plaintiff's Expert Offered Have Been Proven Wrong By *His Own Testimony***

6      As shown in the fact section above, each of the generalized opinions by

7  Dr. Bazinet is contradicted by his own report and deposition testimony.

8      With respect to Dr. Bazinet's first point, that of "complete" and "full" digestion

9  of AQ, he conceded during deposition that (a) he had never studied or tested Prevagen®

10  or AQ; (b) AQ is digested into both amino acids *and* peptides; (c) some peptides can

11  affect brain function without crossing the BBB; and (d) some peptides can cross the

12  BBB and affect brain function.  Part II.D.1 and 2, *supra*.  Dr. Bazinet's report does not

13  even consider the issue of peptides resulting from AQ digestion, much less the

14  possibility that a unique or uncommon peptide small enough to cross the BBB could

15  result from digestion of AQ.  In fact, Dr. Bazinet renders no opinion whatsoever

16  regarding the potential peptides that could result from AQ digestion and whether they

17  could cross the BBB.

18      On Dr. Bazinet's second point, that of "dilution" by dietary proteins, his report

19  does not consider the recommended timing of AQ ingestion (to be taken first thing in

20  the morning on an empty stomach) and how that may affect the body's digestion and

21  absorption of AQ.  (Simon Decl. Ex. B (Bazinet Depo.), 286:5–20; 287:6–14.)

22      Moreover, the "dilution" allegation hinges on the false assumption that all dietary

23  proteins, including AQ, are digested all the way down to amino acids.  Plaintiffs argued

24  that "common amino acids" generated by protein digestion are "no different" from each

25  other regardless of their sources.  (Doc. No. 34 at 1).  But Dr. Bazinet testified that it

26  was mathematically possible for AQ to generate a *unique* small peptide (small enough

27  to cross the BBB) that is different from all peptides generated by other dietary proteins.

28  (Simon Decl. Ex. B (Bazinet Depo.),  299:11–22; 261:18–263:8.)  If an AQ-derived

CALL &
JENSEN

1    peptide is uncommon or even unique, it would not be "diluted" to trivial amounts by

2    other types of peptides generated by other dietary proteins.

3         Furthermore, even if "dilution" of AQ-derived peptides would occur, such

4    "dilution" would not save Plaintiff's case from summary judgment.  Dr. Bazinet

5    testified that a single molecule of peptide can affect brain function.  (*Id*., 277:10–

6    278:10: 278:25–279:13.)  One example he testified about is that proteins and peptides

7    can be ligands, ligands can bind to receptors in neurons, and a single molecule of a

8    ligand may be sufficient to activate a neuron and affect brain function. (*Id.*)  Dr.

9    Bazinet's report does not discuss, let alone rule out the possibility of AQ or an AQ-

10   derived peptide acting in such a manner.  In that sense, no amount of a protein or

11   peptide that acts as a ligand is trivial.  A single molecule could be effective.

12        On Dr. Bazinet's third point, that ingested proteins cannot affect brain function,

13   his deposition testimony revealed three important points that contradicted his earlier,

14   bare assertion.  ***First***, he testified that proteins and peptides can affect memory

15   indirectly *without* crossing the BBB.  (Simon Decl. Ex. B (Bazinet Depo.), 79:2–7;

16   75:4–76:7; 271:18–272:6; 272:19–273:24; 279:20–280:2; 274:2–18.)   His report does

17   not discuss, much less exclude, the possibility that AQ has an indirect effect on brain

18   function or memory.  ***Second***, Dr. Bazinet, again, testified that peptides generated by

19   partial digestion of ingested proteins *can* cross the BBB.  (*Id.*, 59:3–5; 142:11–16;

20   268:5–8.)  Dr. Bazinet also testified that there may be receptors that allow peptides

21   derived from AQ to cross the BBB.  (*Id.*, 238:15–239:17.)  ***Third***, Dr. Bazinet testified

22   that a single molecule that crossed the BBB and entered the brain could act as a ligand

23   and activate a neuron.  (*Id*., 277:10–278:10: 278:25–279:13.)

24        Therefore, Plaintiff's reliance on a generalized, unsupported and rescinded

25   "complete" digestion and "dilution" theory is insufficient to defeat summary judgment.

26   Plaintiff should not be permitted to have his case move forward on bare hypotheses and

27   theories. *King Bio*. 107 Cal. App. 4th at 1345-46.

28

**C.     No Evidence Exists That Quincy Allegedly Deceived Consumers With Respect To Body Chemistry Issues**

To establish liability under fraud-based claims, Plaintiff must show not only the existence of falsity, but also that Quincy "knew, or through the exercise of reasonable care should have known" of the alleged falsity at the time it marketed and advertised its products.  *Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1162 (N.D. Cal. 2011); *see also Baba v. Hewlett-Packard Co.*, No. C 09- 05946 RS, 2010 WL 2486353, at *7 (N.D. Cal. June 16, 2010) (dismissing UCL claim in part because plaintiffs did not sufficiently allege knowledge of the alleged defects); *Bains v. Moores*, 172 Cal. App. 4th 445, 455 (2009) ("To avoid summary adjudication of [their] fraud claim, [plaintiffs were] required to produce evidence of (1) a misrepresentation, (2) knowledge of falsity (or 'scienter'), (3) intent to defraud, *i.e.,* to induce reliance; (4) justifiable reliance, and (5) resulting damage." (internal quotation marks omitted) (alterations in original)).

In *Kowalsky,* the court performed a detailed analysis of UCL and CLRA cases, and concluded that "when federal district courts have considered fraudulent prong claims based on representations about defective products, they have generally required a plausible showing that the defendant knew of the alleged defect when it made the representation alleged to be deceptive." *Id.* at 1160-63 (citations omitted).

Plaintiff does not have a single fact that would tend to show deception on the part of Quincy with respect to Plaintiff's body chemistry allegations.  There is no evidence that Quincy knew, or through the exercise of reasonable care should have known, of the purported body chemistry claims of Plaintiff's proffered expert at the time Quincy marketed and advertised its products.  Since Plaintiff cannot meet this burden of proving his body chemistry allegations and that Quincy knowingly deceived consumers with respect to those issues, he cannot survive summary judgment.  *Johns v. Bayer Corp.*, 2013 WL 1498965, at *1 ("in the absence of *affirmative evidence* that scientific research *did not support* the Prostate Cancer Claim from December 2008 until May 31,

1   2010, the *strength* of Bayer's evidence is irrelevant and Plaintiffs' claims are based on
2   'lack of substantiation' rather than proof of falsity") (emphasis added).

3

4   V.    **CONCLUSION**

5         For the foregoing reasons, in light of the absence of affirmative evidence
6   submitted by Plaintiff and his expert, Plaintiff has not met, and cannot meet, his burden
7   of proffering evidence of his body chemistry allegations.  Given his expert's testimony,
8   there is no genuine issue of material fact that AQ is not completely destroyed via
9   digestion and that it is possible for a portion of AQ to cross the BBB and affect brain
10  function.   Pursuant to this Court's Order, Plaintiff cannot proceed with his false
11  advertising lawsuit.   Therefore, Quincy respectfully requests that the Court enter
12  judgment in favor of Quincy and against the Plaintiff in this case.

13

14  Dated:  November 3, 2015              CALL & JENSEN
                                          A Professional Corporation
15                                        Matthew R. Orr
                                          Joshua G. Simon
16

17
                                          By:*/s/ Joshua G. Simon*
18                                             Joshua G. Simon

19                                        Attorneys for Defendant Quincy Bioscience, LLC

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2015, I electronically filed the foregoing document described as **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANT QUINCY BIOSCIENCE, LLC; MEMORANDUM OF POINTS AND AUTHORITIES** with the Clerk of the Court using the CM/ECF System which will send notification of such filing via electronic mail to all counsel of record.

/s/ *Joshua G. Simon*
Joshua G. Simon

QUI09-02:1601049_10:11-3-15
- 19 -
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANT QUINCY BIOSCIENCE,
LLC; MEMORANDUM OF POINTS AND AUTHORITIES