1  BONNETT, FAIRBOURN, FRIEDMAN
      & BALINT, P.C.
2  PATRICIA N. SYVERSON (CA SBN 203111)
   MANFRED P. MUECKE (CA SBN 222893)
3  600 W. Broadway, Suite 900
   San Diego, CA  92101
4  E-mail:  psyverson@bffb.com
             mmuecke@bffb.com
5  Telephone:  (619) 798-4593

6  BONNETT, FAIRBOURN, FRIEDMAN
      & BALINT, P.C.
7  ELAINE A. RYAN (*Admitted Pro Hac Vice*)
   2325 E. Camelback Road, Suite 300
8  Phoenix, AZ 85016
   E-mail:  eryan@bffb.com
9  Telephone:  (602) 274-1100

10  WELTMAN LAW LLC
    STEWART M. WELTMAN (*Admitted Pro Hac Vice*)
11  3841 N. Wayne Avenue
    Chicago, IL  60613
12  E-mail:  sweltman@weltmanlawfirm.com
    Telephone:  (312) 504-1988

13

14  **Attorneys for Plaintiff and the Class**
    [Additional Attorneys Listed on Signature Page]

15

16  **UNITED STATES DISTRICT COURT**
    **NORTHERN DISTRICT OF CALIFORNIA**

17  | | |
    |---|---|
    | PHILLIP RACIES, on behalf of himself and all others similarly situated, | Case No.:  4:15-cv-00292-HSG |
    | | **PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW** |
    | Plaintiff, | |
    | v. | Judge: Hon. Haywood S. Gilliam, Jr. |
    | QUINCY BIOSCIENCE, LLC, a Wisconsin limited liability corporation | Complaint Filed:  January 21, 2015<br>Trial Date:          January 6, 2020 |
    | Defendant. | |

18

19

20

21

22

23

24

25

26

27

28

I.      **LEGAL STANDARD**

A motion for judgment as a matter of law pursuant to Rule 50(a) should be granted only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. County of Riverside*, 723 F.3d 1104, 1109-10 (9th Cir. 2013) (citing *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)). "[I]n entertaining a motion for judgment as a matter of law, the court ... may not make credibility determinations or weigh the evidence." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Reeves*, 530 U.S. at 150 (2000)). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Instead, the court "must draw all reasonable inferences in favor of the nonmoving party." *Id.*  Thus, the court should credit the evidence favoring the nonmovant and discount evidence supporting the moving party that is contradicted and impeached, or comes from biased witnesses. *Id.* at 151.  The "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *see also Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (quoting *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (the court "may not substitute its view of the evidence for that of the jury")).

II.     **ARGUMENT**

A.      **Plaintiff Has Satisfied His Burden of Presenting Evidence Proving Damages Under His CLRA Claim Using The Full Refund Model**

Under the Full Refund Model, damages are measured by "presuming a full refund for each customer, on the basis that the product has no or only a de minimis value." *Lambert v. Nutraceutical Corp.,* 870 F.3d 1170, 1183 (9th Cir. 2017) (emphasis added).  Contrary to Defendant's assertion, Dkt. No. 268 at 4-5, Plaintiff presented evidence that the Prevagen Products were "valueless and therefore amenable to full refund treatment." *Id.*  Plaintiff also presented evidence from which the jury could

determine that Class' members' approximate damages were $61 million. (Exhibits 451, 473 & 516).[1] No greater precision is required because damages in consumer fraud cases only need to be an approximation of the Class members' damages. *Lambert*, 870 F.3d at 1183; *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015); *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938-39 (9th Cir. 1999) (referring to the UCL and FAL)).

Both Mr. Underwood and Quincy's counsel stated under oath and/or represented in communications to Plaintiff's counsel that Defendant was providing them with *retail* prices paid by consumers in California during the Class Period (Exhibit 451-002) (E-mail messages between Patti Syverson (Plaintiff's counsel) and Joshua Simon (Defendant's counsel) (Sept. 7-12, 2017) (containing defense counsel's affirmative representations as to "requested sales information," "average retail price," and "number of units sold."). At trial, Mr. Underwood conceded that he authorized Defendant's counsel to represent that the information provided in discovery represented *average retail prices*:

> Q. [Mr. Weltman]:  Well, do you know whether you recall or not that you authorized your attorneys to represent to us that these were the retail – average retail prices?
> A. [Mr. Underwood]:  I – I don't recall. I'm a little…. Yeah, that's – ***I guess that's correct***.

Trial Tr. at 269:21-25. As Plaintiff demonstrated during the trial, the jury need only add together retail sales throughout the Class Period to determine aggregate classwide damages. (Exhibits 451, 473 & 516).

Contrary to Quincy's assertion, Dkt. No. 268 at 6-7, California federal courts have approved a full-refund in cases involving drugs or dietary supplements that were ineffective. *See, e.g., Allen v. Hyland's, Inc.*, 300 F.R.D. 643, 671 & nn. 25-26 (C.D. Cal. 2014). They have also approved a full refund where class members received none of the "advertised benefits." *Mullins v. Premier Nutrition Corp.*, 178 F. Supp.3d 867, 898-99 (N.D. Cal. 2016) (allowing full refund model where product was advertised to "treat joint health problems or to keep joints healthy" but did not); *Makaeff v. Trump University*, 309 F.R.D. 631, 640 (S.D. Cal. 2015) (allowing full refund model where plaintiffs' theory of liability was that the students "received none of the *advertised* benefits of [Trump University]")

---

[1]   All "Exhibit __" references are to exhibits admitted at trial.

(discussing cases).  By contrast, the three cases Defendant relies on (Dkt. No. 268 at 6) are food and clothing cases in which "plaintiffs undeniably obtained some value from the garments they purchased, separate and apart from the deceptive advertising practices," *Strathakos v. Columbia Sportswear, Co.*, 2017 WL 1957063, at *10 (N.D. Cal. May 11, 2017); or the benefit of buttery taste despite the under-stated calories and fat, *Allen v. ConAgra Foods, Inc.*, 331 F.R.D. 641, 673 (N.D. Cal. 2019); or the nutrition of the bread products mislabeled as "excellent source[s] of whole grain," *Ang v. Bimbo Bakeries USA, Inc.*, 2018 WL 4181896, at *13 (N.D. Cal. Aug. 31, 2018).

Here, Plaintiff and Class members received no value whether or not they purchased products with vitamin D.  Contrary to Quincy's assertion, Dkt. No. 268 at 6, Plaintiff did not fail to prove that "Prevagen as formulated with vitamin D is worthless".  The fact that the addition of vitamin D had absolutely no impact on the value of Prevagen is reflected in Quincy's own discovery responses. Quincy's counsel, Joshua Simon, affirmatively represented that the "average retail price[s]" of the Prevagen Products sold in California, Ex. 451-002, as listed on the spreadsheet produced by Quincy in discovery on September 7, 2017, Ex. 516-005. This data included the four quarters in 2016 – both before vitamin D was added and after.  Mr. Underwood testified that vitamin D was added to Prevagen sometime in the "Summer" or "Fall" of 2016. Yet if one compares the pricing of Prevagen in the First Quarter of 2016 versus the fourth quarter of that year, one sees that there is no discernible difference in the amount that consumers paid or even if the prices that were charged and paid by its direct purchasers (retailers and wholesale purchasers).  Thus, as Exhibit 516-005 shows, the price of Prevagen Extra Strength in the First Quarter of 2016 was $34.57, when no vitamin D was in the product; in the Fourth Quarter of 2016, it was $34.22 when vitamin D *was* added.  And it remained in that same range during the first half of 2017.  Whether these prices were retail prices, as admitted by Quincy and its counsel, or wholesale prices makes no difference for this comparison as, in either event, it is an apples-to-apples comparison.  The before - and - after prices for all of 2016 and the first half of 2017 are set forth below for the Court's convenience.

- 3 -

| Sales Period | Average Retail Price (Extra Strength) | Average Retail Price (Regular Strength) (30 ct) |
|---|---|---|
| 2016 Q1 | $ 34.57 | $25.16 |
| 2016 Q2 | $ 34.42 | $25.20 |
| 2016 Q3 | $ 34.23 | $25.01 |
| 2016 Q4 | $ 34.22 | $24.95 |
| 2017 Q1 | $ 34.81 | $25.32 |
| 2017 Q2 | $ 34.43 | $25.13 |

Ex. 516-005.

Thus, on this record, to the extent that Quincy claims that vitamin D provided *any* value, Plaintiff submitted evidence in the record from which it can be inferred that the vitamin D added had no value and, thus, it can inferred that it provides no brain health benefits. Thus, it was *Defendant's* burden to prove vitamin D's purported value and any asserted offset. *See Trump Univ.*, 309 F.R.D. at 642-43. And it is Defendant who suffers from a failure of proof on this issue – not Plaintiff. Even so, using what Quincy's counsel, Joshua Simon, affirmatively represented to be the "average retail price[s]" of the Prevagen Products sold in California, Ex. 451-002, as listed on the spreadsheet produced by Quincy in discovery on September 7, 2017, Ex. 516-005, the jury can find that the addition of vitamin D in what Mr. Underwood described as the "Summer" or "Fall" of 2016 (Trial Tr. 201:11-15), made no discernible difference in how Quincy valued its addition and the amount that consumers paid to buy the products.

Under the Full Refund Model, damages are measured by "presuming a full refund for each customer, on the basis that the product has no or only a de minimis value." *Lambert*, 870 F.3d at 1183 (emphasis added). Contrary to Quincy's assertion, Dkt. No. 269 at 6-7, the California federal courts have approved a full refund in cases involving drugs and dietary supplements that were not effective, as well as cases involving other consumer-type products. *See, e.g., Allen v. Hyland's, Inc.,* 300 F.R.D. 643, 671 & nn. 25-26 (C.D. Cal. 2014); *Makaeff v. Trump Univ.,* 309 F.R.D. 631, 639 (S.D. Cal. 2015) (allowing full refund model where plaintiffs' theory of liability was that the students "received none of the ***advertised*** benefits of [Trump University]") (emphasis added); *Mullins v. Premier Nutrition Corp.,* 178 F. Supp. 3d 867, 898-99 (N.D. Cal. 2016) (Seeborg, J.) (allowing full refund model where

- 4 -

product was advertised to "treat joint health problems or to keep joints healthy" but did not do so); *Farar v. Bayer AG,* 2017 WL 5952886, *9-11 (N.D. Cal. Nov. 15, 2017) (Orrick, J.) (where consumers purchased multivitamin products and alleged that defendants' products contained false or misleading health claims relating to heart health, immunity, and physical energy, and presented a damages model that provided for full restitution because defendants' products provided no health benefits to consumers, and did not provide any other benefits that foods might, such as calories, satisfaction of hunger, tastiness, or nutrition; Judge Orrick "agree[d] with plaintiffs" and rejected defendants' argument that their multivitamins were food products and provided nutritional value in the form of essential vitamins and nutrients; the court observed:  "No plaintiff claimed that she decided to purchase [defendants'] products for the so-called [vitamin] benefit.  Nor do defendants market this supposed benefit on the then product packaging or other marketing materials.").

Here, Plaintiff presented evidence that the key and only represented active ingredient in the Prevagen Products, AQ, was "valueless and therefore amenable to full refund treatment."  *Lambert,* 870 F.3d at 1183.  There is no evidence in the record that the addition of Vitamin D in "Summer" or "Fall" of 2016 provided even "a de minimis value" to California consumers, and the above-referenced analysis shows that even Quincy knew this because it did not charge (nor could it) any more money for the odd addition of vitamin D to its products.

And if the "no change" in pricing were not enough, there was no change in the Brain Health Representations because the labels, Ex. 536 and Ex. 355, all make similar if not identical Brain Health Representations, including the key ones about memory, clearer thinking, and sharper mind.

Contrary to Quincy's assertion, Dkt. No. 269 at 7, Plaintiff did not fail to take account of the "value" that vitamin D supposedly "adds" to Prevagen. As noted above, the evidence introduced by Plaintiff allows the inference that *no value* was imparted by the addition of vitamin D in 2016. And as Mr. Underwood admitted, Quincy did not proclaim to consumers that the addition of vitamin D changed the product in any way with regard to the Brain Health Representations. It was merely mentioned in the ingredient listing on the back of the package, as opposed to the emphasis on AQ the front of the labeling (including pictures of jellyfish in the upper left-hand corner) and throughout its

- 5 -

promotional materials.  (*See* Ex. 355 – depicting front labels of all three products in the Class Period as well as promotional materials, all of which emphasized AQ and its connection to jellyfish, as the sole active ingredient).

In fact, in documents submitted to the Food and Drug Administration, Quincy continuously equated AQ as being Prevagen.  Thus, for example, in its GRAS submission Quincy states: "Apoaequorin protein preparation manufactured as Prevagen ® has been marketed as a dietary supplement, since 2007." Thus, in Quincy's own words, since 2007 its synthetic AQ had been sold under a trademarked name Prevagen ® - or, in other words, as per Quincy, AQ is Prevagen and Prevagen is AQ.  *See* Ex. 4-034. *See also* Ex. 4-028, 036, 037, 038. So, whatever purpose there was to add vitamin D to the products, Prevagen is AQ.

Finally, even if *all* of the sales information provided by Quincy and its counsel in discovery represented "wholesale," rather than California "retail" sales – and it does not – the Ninth Circuit's analysis of this issue in *Lambert* makes clear that the jury has been supplied with enough information to compute damages – even if the result reached is an approximation:

> This is not to say that every case proceeding under a full refund theory must produce figures for the average price and unit sales of a product. As Lambert argued in his motion for class certification, point-of-sale data approximating the total retail expenditure would also be an appropriate method of calculating restitution on a worthless item. ***So, too, would evidence of the defendant's wholesale revenue, if reasonably capable of being weighed or adjusted by the trier of fact to account for the possible difference between wholesale and retail values.***

870 F.3d at 1183 n.9 (emphasis added).  The Prevagen Products' sales sheets – Exhibits 349-001 & 355-012 – provide the jury with a means of "weigh[ing] or adjust[ing]" the "wholesale revenue" to determine its equivalent in "retail values."

Further, "wholesale sales" figures are undisputedly "conservative" figures.  *Rikos v. Procter & Gamble Co.*, 2014 WL 11370455, at *13 (S.D. Ohio June 19, 2014), *aff'd*, 799 F.3d 497 (6th Cir. 2015) (analyzing California UCL and CLRA claims).  Moreover, as a general matter, a wrongdoer cannot escape liability by stating that its records do not permit calculating damages or restitution with exact precision.  As Judge Black stated:

The principle is an ancient one and is not restricted to proof of damage in antitrust suits" that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946). Accordingly, while the jury "may not render a verdict based on speculation or guesswork" the jury "may make a just and reasonable estimate of the damage based on relevant data...[and] act upon probable and inferential, as well as direct and positive proof." *Id.* at 264. "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Bigelow*, 327 U.S. at 264.

2014 WL 11370455, at *13 (citations omitted).  Ex. 355 shows that wholesale prices for Prevagen were *lower* than suggested retail prices. In this case, as in *Rikos*, the jury has a "wealth of evidence from which a just and reasonable estimate of damages or restitution" can be made.  *Id.* at *14.

Finally, through Mr. Underwood's verified declaration and Defendant's counsel's unequivocal statements, Defendant represented that the numbers provided were for sales in California and to California consumers.  Quincy never contended in its discovery responses that these were sales to retailers/wholesalers **AND** that part of what was sold to them would have been sold to consumers out-of-state.

Yet, Mr. Underwood (and, thus, Quincy) tried to muddle this with his purely speculative, contradictory, and impeachable testimony during trial (contradicting what he and Quincy's counsel stated in the discovery responses), that some unquantified part of the sales were to retailers who may or may not have sold all of what they received in California to consumers in California  (even though they admitted that part of what was included was clearly retail pricing as it reflected direct to consumer sales).

But even if some of the Prevagen Products were sold by retailers or wholesalers to out-of-state consumers (of which there is no non-speculative evidence – let alone in a material amount), one must just as readily speculate that retailers out-of-state did the same and sold some of what they obtained in other states into California.[2]

Thus, for all of the above-stated reasons, Plaintiff has satisfied his burden of presenting

---

[2] It is reasonable to assume that the two would even out such that the sales numbers presented to Plaintiff by Defendant are at least a reasonable estimation of sales to Class members if not, as Defendant consistently stated in its discovery responses, the actual sales to California consumers.

evidence proving damages under his CLRA claim.

**B.     Plaintiff Has Satisfied His Burden of Presenting Evidence Proving Reliance**

Contrary to Defendant's assertions, Dkt. No. 268 at 6-8, in his trial testimony Plaintiff proved *reliance*.  He testified that in September 2014 he bought Prevagen in reliance upon the labeling representations:

> "It says it targets enhancing memory and improving brain functioning.  It – Yeah, so it looked like it was targeted right for what I was feeling I needed help with at the time." (Trial Tr. at 137:15-18).

> "It described clinical studies that had been done.  You, you know, I'm sensitized to peer research or clinically researched things, so that – that was the right bell for me."  (*Id.* at 140:5-7).

> And, "[t]hat it addresses memory problems.  It improves memory, focus, recall.  It – it seemed like a – a relatively natural supplement. I remember the jellyfish reference, said clinical studies done on it, I think a blind placebo. I believe I got the impression in a relatively short amount of time I would -- I would experience improvement in my memory." (*Id.* at 140:17-20).

Plaintiff's testimony stands in stark contrast to that of the plaintiff in *Withers v eHarmony, Inc.*, 2011 WL 8156007, at *3 (C.D. Cal. Mar. 4, 2011), upon which Defendant relies, in which "plaintiff admits he did not read the terms and conditions provided by defendant, which outlined the terms of service."  *Id*.  From his trial testimony, Plaintiff has proven that he and other reasonable consumers relied upon Defendant's Brain Health Representations and that they were material to a reasonable consumer.[3] If that were not enough, Exhibit 355, Defendant's sales presentation, shows that Quincy knew these representations were material because it states: "63% of American[sic] surveyed feared losing their mental capacities. This is their greatest health-related fear."  And that "[s]tudies show people over age 60 fear memory loss equal to fear of cancer."  *Id*.  Notwithstanding Defendant's counsel's argument that somehow Mr. Racies did not buy a Prevagen Product with the key "Improves Memory" "tagline" (as Mr. Underwood put it – the one in the big letters on the front

---

[3] Mr. Racies' trial testimony is more than sufficient to provide the requisite amount of evidence that he saw one or more of Quincy's alleged misrepresentations, that he actually relied on those misrepresentations, and that he was harmed thereby.  *See In re Apply iPhone App. Litig.*, 6 F. Supp. 3d 1004, 1027 (N.D. Cal. 2013) (Koh, J.); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp.*, 326 F.R.D. 592, 608 (N.D. Cal. 2018) (Cousins, M.J.); *In re HP Inkjet Printer Litig.*, 2008 WL 2949265, at *4-5 (N.D. Cal. July 25, 2008) (Fogel, J.).

of the label (Trial Tr. at 296:9-19)), Mr. Underwood (and thus Quincy) admitted that this key representation appeared on the packaging in 2013, at least one year before Mr. Racies purchased Prevagen Regular Strength.  *Id*. at 295:3-6 ("Q. Sometime in 2013, labels with "Improves Memory" on the labels was being shipped out? A. That's probably -- if it's just within a year, I would say [t]hat's probably right.").

And there is no doubt that the same common Brain Health Representations were communicated to Class members during the Class Period.  Mr. Underwood's above-quoted testimony confirmed that. (Trial Tr. at 295:3-6).  And, importantly, while initially testifying on cross-examination that labels with the tagline that said "Brain Cell Protection" – like the one Defendant argues Plaintiff supposedly purchased – did not include the words "improves memory" (*Id*. at 289:23-290:1), on redirect examination Mr. Underwood admitted that bottles that started shipping in 2013 with the "improved memory claim" also may have mentioned "Brain Cell Protection" (*Id*. at 296:1-6).  Even if for some short early part of the Class Period the labels were like the "Brain Cell Protection" label that counsel for Defendant had Mr. Underwood identify (Exhibit 536), a simple review of both the front and side panels show that similar Brain Health Representations were made to the Class ("clearer thinking," "healthier brain," and "sharper mind" on its front face and on the side panel states that as we age we lose proteins that affect "our ability to learn, retain memories, think and concentrate," that Prevagen replaces these proteins and "protects our cells during this natural process of aging"). Substantively there is no meaningful difference between the Brain Cell Protection labels and Ex. 355 – the labels used with "improves memory" from 2013 forward, as each makes the same or similar brain health representations.

Mr. Underwood also testified that the labels began referencing clinical trials *after* 2010 when the Madison Memory Study trial was completed.  (*Id*. at 300:18-301:7).  This is something that Mr. Racies testified also influenced his purchase decision.  (*Id*. at 140:4-141:1).  And as Exhibit 355 (the Quincy sales presentation) demonstrates, the "Clinically Tested" representation is on the front of the labels, directly above the "improves memory" representation on each of the products sold to Class Members.

1
2
3
4
5
6
7

Even though the introduction of actual labels was not required after these admissions by Mr. Underwood, there are labels in evidence that show that these were, in fact, the representations that were made to the members of the Class during the Class Period. (*See* Exhibit 355-001 – each of the three Prevagen Product labels at issue is clearly depicted in this document, as well as Exhibit 536 discussed above (the so-called "Brain Cell Protection" label)).  Thus, the jury has before it evidence from which it may properly find that throughout the Class Period Quincy consistently made the same or similar Brain Health Representations which Plaintiff and the Class were necessarily exposed to at the point-of-purchase.

8
9
10

Dated: January 12, 2020

Respectfully Submitted,
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.

11
12
13
14
15

By: */s/ Patricia N. Syverson*
Patricia N. Syverson (CA SBN 203111)
E-mail:psyverson@bffb.com
Manfred Muecke
E-mail:Mmuecke@bffb.com
600 W. Broadway, Suite 900
San Diego, CA 92101
Telephone:  (619) 798-4593

16
17
18
19

BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
Elaine A. Ryan (*Admitted Pro Hac Vice*)
E-mail:eryan@bffb.com
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Telephone:  (602)-274-1100

20
21
22
23

WELTMAN LAW LLC
STEWART M. WELTMAN (*Admitted Pro Hac Vice*)
3841 N. Wayne Avenue
Chicago, IL  60613
E-mail:sweltman@weltmanlawfirm.com
Telephone:  (312) 504-1988

24
25
26
27

WILENTZ, GOLDMAN & SPITZER, P.A.
Kevin P. Roddy (CA SBN 128283)
E-mail:kroddy@wilentz.com
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095

28

- 10 -

Telephone:  (732) 636-8000

**Attorneys for Plaintiff and the Class**

- 11 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 12th day of January 2020.

*/s/ Patricia N. Syverson*
Patricia N. Syverson (CA SBN 203111)
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
600 W. Broadway, Suite 900
San Diego, CA  92101
E-mail:psyverson@bffb.com
Telephone:  (619) 756-7748

- 12 -